## Graham's Estate.

*Wills—Trusts—Stock — Extraordinary stock dividends — Distribution —*
*Effect of death of one of life-tenants before distribution.*

1. Where shares of stock included in a trust fund are increased after the death of testator and one of the life-tenants, by the issue of a special stock dividend of a merged company, without decreasing the value of the original shares as compared with their value at testator's death, such special dividend is to be treated as income and distributed among those entitled thereto at the time the dividends were declared to the exclusion of the personal representative of the deceased life-tenant.

2. It is immaterial that a portion of the earnings from which the stock dividend was declared may have accrued prior to the death of the deceased life-tenant, since the earnings or surplus belong to the corporation until distributed to the stockholders in the form of dividends, and it is the date of such distribution which must control.

Exceptions to adjudication. O. C. Phila. Co., April T., 1900, No. 186.

THOMPSON, J., Auditing Judge.— . . . This trust arose under the will and codicils of testator, who died Dec. 21, 1898, whereby he gave the residue of his estate to the Philadelphia Trust, Safe Deposit and Insurance Company as trustee, to pay the net income to be derived therefrom, three-fourths to his niece, Henrietta H. Dunne, during life, and upon her death, in case she left no children or descendants her surviving—which event happened—(and certain provisions which could not take effect because of prior deaths), to pay the same to his nephew, John S. G. Dunne, and his grandnieces, Essie H. Dunne, afterwards Klink, Dorothy G. Dunne, afterwards Artis, and Henrietta Cherry, afterwards Barr, during life; and one-twelfth each of said net income to said S. G. Dunne, and two-twelfths to Henrietta H. Dunne or her appointees after her decease, for his grandnieces, Essie H. Dunne and Dorothy G. Dunne, during life, with provisions to take effect upon the deaths of the persons entitled to said three-twelfths, not now necessary to recite; and with limitation over of principal upon the death of all the life-tenants in equal shares to the Old Ladies' Home at Wissinoming, the Home for Aged Couples and the Home of the Merciful Savior for Crippled Children. . . .

Henrietta H. Dunne died Nov. 27, 1923, unmarried and without issue, leaving a will upon which letters testamentary issued to the Philadelphia Trust Company, executor, and whereby she gave the residue of her estate one-half to her brother, John S. G. Dunne, and one-fourth each to her nieces, Essie H. Klink and Dorothy G. Artis. She did not, however, appoint a trustee or caretaker for Essie H. Klink or Dorothy G. Artis, but, by decree of this court of Feb. 28, 1924, Granville Klink was appointed trustee or caretaker for them.

John S. G. Dunne, Essie H. Klink, Dorothy Artis and Henrietta Barr are still living.

The Philadelphia Trust, Safe Deposit and Insurance Company, afterwards the Philadelphia Trust Company, on July 10, 1926, became merged with the Fidelity Trust Company under the name of the Fidelity-Philadelphia Trust Company, by which the present account is filed. And the account is filed to have determined the disposition of 150 shares of the capital stock of said Fidelity-Philadelphia Trust Company set forth in the account as follows:

"1926, July 28, Surrendered 100 shares, Philadelphia Trust Company (par 100) under Plan of Consolidation with Fidelity Trust Company. Received 150 shares of Fidelity-Philadelphia Trust Company (par 100)."

It appeared that the Philadelphia Trust Company, having an outstanding capital of $1,000,000, divided into 10,000 shares, par $100, with a surplus of

Graham's Estate.

$5,000,000 and undivided profits of $1,212,079.48, and the Fidelity Trust Company, with an outstanding capital of $5,200,000, divided into 52,000 shares, par $100, with a surplus of $16,000,000 and undivided profits of $2,128,510.86, desired to become consolidated into one corporation, so that "all the property"—capital assets, surplus and undivided profits—"rights, franchises and privileges vested in each of said corporations" should be transferred to and vested in said new and consolidated corporation to be known as "The Fidelity-Philadelphia Trust Company, and entered into a joint agreement of consolidation which was to become effective only after the stockholders of the Philadelphia Trust Company should have duly authorized an increase of its capital stock from $1,000,000 to $1,500,000—an increase of 5000 shares of $100 par; that the capital stock of the new corporation should be $6,700,000, divided into 67,000 shares of the par value of $100 each—$500,000, or 5000 shares in excess of the then outstanding capital of the two corporations; and that the surplus and undivided profits of the new corporation" should be "equal to the aggregate amount of the surplus and undivided profits of the constituent companies, as above set forth, less the sum of $500,000 applied to the increased capital stock to be issued" under the agreement; and then the stockholders of the Philadelphia Trust Company were to receive one and one-half shares of the new stock for each share of the stock then outstanding, and the stockholders of the Fidelity Trust Company one share of new stock for each share outstanding.

As the ratio of surplus to capital of the Philadelphia Trust Company was greater than that of the Fidelity Trust Company, it is clear that had the capital of the new corporation remained the same as the combined capital of the two corporations, and all the property of both corporations transferred to the new corporation, and each shareholder of the new corporations only received share for share, the shareholders of the Philadelphia Trust Company would have had the short end of the bargain. This was adjusted by the proposed increase of the capital stock of the Philadelphia Trust Company by $500,000 and the proposed reduction of the combined surplus and undivided profits by $500,000.

It was expressly stipulated that the merger should not take effect until the shareholders of the Philadelphia Trust Company had authorized this increase in its capital stock and approved the consolidation agreement.

Accordingly, on June 30, 1926, the stockholders of the Philadelphia Trust Company authorized an increase of $500,000 in its capital stock and approved the agreement of consolidation; and, as appears from the stipulation of facts, the Philadelphia Trust Company, on its books, transferred $500,000 from undivided profits to capital account. No new certificates by the Philadelphia Trust Company were actually issued, or intended to be issued, and no further action in that direction was taken by the Philadelphia Trust Company.

On July 10, 1926, the property of the two companies as thus reconstituted was merged, and the capital stock of the two corporations issued as agreed— one share to each holder of a share of the Fidelity Trust Company, and one and a-half shares to each holder of a share of the Philadelphia Trust Company. By this process, the accountant surrendered 100 shares of Philadelphia Trust Company stock to the new corporation and received 150 shares of the Fidelity-Philadelphia Trust Company. It is under these facts that the question of the character of the additional half share in the new corporation issued to each holder of a share in the Philadelphia Trust Company, and the proper distribution of the excess of fifty shares accounted for, has arisen.

Graham's Estate.

As defined by Bouvier, Third Revision Rawle, 898, "Dividend, as confined to corporations, is that portion of the profits and surplus funds of the corporation which has actually been set aside by a valid resolution of the board of directors, or by the shareholders, at a corporate meeting for distribution among the shareholders according to their respective interests, in such sense as to become segregated from the property of the corporation and to become the property of the shareholders distributively. . . . Where stockholders, including directors, met and agreed to a division of profits, but without formally declaring a dividend, their action was equivalent to such declaration: Spencer v. Lowe, 198 Fed. Repr. 961. The earnings of the corporation are part of the corporate property, and, until separated from the general mass, the interest of the stockholders therein passes with the transfer of the stock. . . . By the declaration of the dividend, however, the earnings to the extent declared are separated from the general mass, and are appropriated to the then stockholders, who become creditors to the corporation for the amount of the dividend. The earnings represented by the dividend, although the fruit of the general property of the company, are no longer represented by the stock, but become a debt of the company to the individual, who, at the time of the declaration of the dividend, was the owner of the stock:" Ibid., 900.

It is conceded that if the Philadelphia Trust Company had actually issued the stock representing the increased capital authorized by its stockholders, no question could arise. But, "in a court of equity, as the Orphans' Court is within the sphere of its jurisdiction, substance is never sacrificed to form:" McKeown's Estate, 263 Pa. 84; and equity considers that as done which ought to have been done, and would have been done in the present case if the usual and parliamentary methods of business had been followed.

It must not be overlooked that the stockholders of the Philadelphia Trust Company, on June 30, 1926, not only authorized the increase of its capital stock, but approved and adopted the consolidation agreement. That agreement clearly contemplated the withdrawal of $500,000 from surplus and undivided profits of the Philadelphia Trust Company before the merger took place, by providing that the surplus and undivided profits of the new company should be, not the whole amount of surplus and undivided profits of the constituent companies, but that amount, "less the sum of $500,000 applied to the increased capital stock to be issued hereunder." Was not this $500,000 assets of the Philadelphia Trust Company segregated from its profits to justify the increase of its capital? It no longer, then, belonged to the Philadelphia Trust Company, but its shareholders; and the short-cut method pursued by the parties to the consolidation could not deprive those shareholders of it. It is a debt of the Philadelphia Trust Company to its shareholders to be paid by the Fidelity-Philadelphia Trust Company in its stock, and was so paid by the issue of the additional half share with each share to the holders of the original stock of the Philadelphia Trust Company.

Against this view, Goldsmith v. Swift, 35 Hun (N. Y.) 32 (Supreme Ct. Reps.), is cited on behalf of the remaindermen. But there, as here, the trustee, held 100 shares of stock; he also held scrip for 80 per cent. of the capital, representing earnings of his company applied to capital improvements (which was construed as income, and thus in line with our cases), and received twenty-seven additional shares of the new company to equalize the values of the merged company. In the present case there was no stock issued for the purpose of equalizing the value of the interests of the stockholders in the new company. That equalization has been accomplished by the increase in the stock of the Philadelphia Trust Company and the reduction of the

combined surplus and undivided profits because appropriated by the Philadelphia Trust Company to said increase.

I, therefore, hold that fifty shares of Fidelity Trust Company stock contained in the account must be considered as an extraordinary dividend out of earnings and distributable according to the rules laid down in our cases from Earp's Appeal, 28 Pa. 368, to Waterman's Estate, 279 Pa. 491.

There was no evidence submitted of intrinsic value of the various stocks at the respective dates above given; the only values furnished are book values, which, for the purposes of this adjudication and in the absence of testimony showing that such book values are in excess of intrinsic value, I assume are the actual values of the respective stocks at the dates stated.

The book value of a share of the Philadelphia Trust, Safe Deposit and Insurance Company as of Dec. 31, 1898, the date nearest to the death of the testator, Dec. 21, 1898, was $354.054212.

On Nov. 27, 1923, the date of death of Henrietta H. Dunne, $663.507869.

On July 10, 1926, prior to capital rearrangement, $739.173195.

And after the transfer of $500,000 from surplus to capital (assuming this to mean the value of a share in the increased capital of the Philadelphia Trust Company) was $492.78213.

After the merger, the book value of a share in the consolidated company, Fidelity-Philadelphia Trust Company, was $472.94445.

It, therefore, appears that, in lieu of 100 shares of the Philadelphia Trust Company at $354.054212 per share, the accountant now holds 150 shares of stock of the Fidelity-Philadelphia Trust Company at $472.94445 per share, an increase in value of $118.89033 per share, and I, accordingly, find that said fifty shares are income accrued to this estate on June 30, 1926.

Who, then, is entitled to this income?

Henrietta H. Dunne died Nov. 27, 1923, and the action of the Philadelphia Trust Company, above referred to, was not had until June 30, 1926, and the merger of the two companies not actually effected until July 10, 1926. On the ground that part of the profits of the Philadelphia Trust Company transferred to capital was earnings since the death of testator, it is plain, on behalf of her estate, that part of the fifty shares should be awarded to that estate. On the other hand, the life-tenants succeeding to income on her death and who are still living claim all the shares as income accrued to the estate at that time; while the remaindermen claim all the shares on the theory that the 150 shares of Fidelity-Philadelphia Trust Company were received by the accountant merely as an exchange for the 100 shares of the Philadelphia Trust Company held by the estate before the merger.

The last contention may be dismissed for the reasons already given for holding such shares as dividend. Whether there is only one life-tenant or successive life-tenants, the decisions clearly are that the ultimate remainderman is entitled but to the estate of testator as of the time of death, with only such accretions incident thereto as are not subject to the equitable principles in the cases cited.

In Flaccus's Estate, 283 Pa. 185 (194), Mr. Justice Simpson said: "In other jurisdictions many and varied are the methods applied in the distribution of extraordinary corporate dividends under such circumstances; but in this State we have long since abandoned the technical rules applied elsewhere, and distribute such dividends, if declared out of profits, whether they be cash, scrip or stock (Smith's Estate, 140 Pa. 344, 352; Stokes's Estate, No. 1, 240 Pa. 277, 280-1), according to equitable principles, allotting to *corpus* so much of them as is necessary to make good any reduction of actual value

from that which existed at the time the trust was created and giving the balance to those entitled to the accruing income. From Earp's Appeal, 28 Pa. 368, to Waterman's Estate, 279 Pa. 491, we have steadily adhered to this rule, which, in principle, is as applicable to every case where one gets the *corpus* at a given date, and another the income pending final distribution, as it is to the ordinary case of life-tenants and remaindermen. In each the same reason exists for refusing to give the first taker the income which had accrued on the stock prior to the creation of the trust, or to the remainderman that which had accrued after its creation; and this, as stated, is true whether the gift in remainder is specific, demonstrative or general."

And in McKeown's Estate, 263 Pa. 78, the same learned Justice announced as the settled law of this State that "an extraordinary corporate dividend is presumptively payable to the party entitled to the income at the time the dividend was declared; but this presumption must yield to proof of the fact, and if it appears that by such dividend the corporate assets are reduced below their value at the time the trust began, the principal must be made good before anything is awarded to income."

As the fifty shares in question have been held an extraordinary dividend, and its declaration has not diminished the value of testator's estate as of the time of his death, it is clear that, in the present case, there are no facts to which the presumption can yield. The surplus of a corporation until it is distributed by proper corporate action belongs to the corporation, and until such time no right to distribution accrued to the stockholder, and, consequently, does not accrue under his will to a deceased life-tenant. Connolly's Estate, No. 1, 198 Pa. 137, distinctly holds that the rights of a life-tenant are "no greateer than the testator's in his lifetime, and as he could not have compelled a distribution of the surplus profits in dividends, she could not; and as she could not obtain them in her lifetime, surely her personal representatives after her death cannot, neither from the corporation nor the legatees in remainder."

Connolly's Estate was followed by this court in Crosman's Estate, 14 Dist. R. 40, where President Judge Hanna held that an extraordinary dividend is payable to parties entitled to the income of the trust estate at the time it was declared, and not apportionable. See, also, Engel's Estate, April Term, 1895, No. 570; Thompson's Estate, 6 D. & C. 503, under the Act of 1917.

However, in Simpson's Estate, 23 Dist. R. 27, where there had been a succession of prior extraordinary dividends, of which admittedly the life-tenant had not received her proper share, a dividend declared after the life-tenant's death was apportioned, President Judge Dallett, whose adjudication was confirmed by the court, saying: "Whether, when applied, the rule (of such apportionment) will work satisfactorily in all cases remains to be determined. It would seem to the Auditing Judge to eliminate the possibility of any enhancement in the value of principal (which might, nevertheless, be altogether wiped out) and to necessitate distribution back over perhaps many years and to the estates of *cestuis que trustent* long since dead."

In all these cases there was but one life interest.

But in Willcox's Estate, 66 Pa. Superior Ct. 182, an apportionment between the estate of a deceased life-tenant and succeeding life-tenants was permitted *because all parties agreed to it.* Judge Porter, however, said: "This principle (of apportionment) being conceded by the learned counsel for both appellant and appellee, we have not deemed it necessary to consider or discuss its soundness." And, further (as bearing on the question of elimination of "the possibility of any enhancement in the value of principal"), "the

Graham's Estate.

increase of the (ordinary) dividends may cause an actual increase in the value of the stock, even though no undivided profits be added to the surplus, and such an increase in value belongs to the principal of the trust estate, and must go to those who take in remainder: Connolly's Estate, 198 Pa. 137; Graham's Estate, 198 Pa. 216."

Life-tenants taking after a precedent life estate are as really legatees in remainder upon the expiration of that estate as are the ultimate remainderman taking upon the expiration of all the precedent estates. Blackstone defines a remainder as an estate limited to take effect and be enjoyed after another estate is determined: 2 Bl. Comm., 163. "An estate in lands, tenements or hereditaments in such interest as the tenant has therein:" 2 Bl. Comm., 103.

The settled policy of the law is to give to every beneficiary under a will exactly what the testator gives; and as the fifty shares in question are, as heretofore found, to be regarded as income accrued during the present life tenancy, irrespective of when the profits accrued to the corporation, so they accrued since testator's death, it would, in my opinion, be doing violence to testator's express wishes to give any portion thereof either to the equitable life-tenant, who died before its accrual, or to the remaindermen, who are only entitled to the estate as it existed at testator's death, with whatever accretions thereto there may be when the trust ends.

It may be of interest, too, to note that on the face of the records of the Philadelphia Trust Company the amount of the increased capital was charged against undivided profits, and that the undivided profits at that time were $1,212,079.48. It does not appear whether any of these undivided profits were earned in the lifetime of Henrietta H. Dunne. If not, the case would seem to fall within Waterman's Estate, 279 Pa. 491.

For the reasons given, I award said fifty shares to the persons who, on June 30, 1926, were entitled to income. The account shows debit items of principal of personal estate—the 150 shares of Fidelity-Philadelphia Trust Company stock being carried short—of $149,334.36, and contains credit items of $113.14, leaving a balance of $149,221.22. And also shows a balance of principal of proceeds of sale of real estate of $8661.71; total, $157,882.93.

As, under this adjudication, the estate, instead of 100 shares of stock of the Philadelphia Trust Company, now holds 100 shares of Fidelity-Philadelphia Trust Company as part of the principal, the said shares will be appraised and the above balance, as affected by said appraisement, composed as indicated in the account, is awarded to the accountant as trustee for John S. G. Dunne, Essie H. Klink, Dorothy G. Artis and Henrietta Barr, upon the uses and trusts declared by the will of the testator.

The account also shows a balance of income of $190,275.71, to which add fifty shares of capital stock of the Fidelity-Philadelphia Trust Company, $————, making a total of $————, which, less commissions due accountant at 3 per cent. on said Fidelity-Philadelphia Trust Company stock, and together with all additional income or interest on deposit to date of payment, is awarded to be distributed to the parties entitled to income in the proportions directed by the will as construed by this adjudication; the award of any unpaid income to Henrietta H. Dunne, under the terms of this adjudication, to be paid to the executor of her will; the award to Essie H. Klink of her original share of income to be paid to her guardian; the award of that accruing to her on the falling in of the life estate of Henrietta H. Dunne to be paid to her directly, unless the guardianship extends to her entire estate; and all awards to be subject to any payments heretofore made on account of distribution.

Graham's Estate.

Counsel will prepare a schedule of distribution in duplicate, and certify to its correctness in conformity herewith, which, when approved by the Auditing Judge, will be annexed hereto and form part hereof. . . .

And now, Jan. 26, 1928, the account is confirmed *nisi.*

*J. H. Shoemaker,* for exceptant.

*Charles Myers (Barnes, Biddle & Morris* with him), contra.

LAMORELLE, P. J., June 29, 1928.—A majority of the court are of opinion that exceptions 1, 2 and 4, which go to the award of all income, result of an extraordinary dividend, which dividend the Auditing Judge awarded to the present *cestui que trust* to the exclusion of a former *cestui que trust* (now deceased), should be dismissed for the reasons given by the Auditing Judge in his adjudication.

We are of opinion that exception 3, which reads as follows: "The learned Auditing Judge erred in finding that it does not appear whether any of the undivided profits of the Philadelphia Trust Company were earned in the lifetime of Henrietta H. Dunne, deceased," is irrelevant, in view of the findings of fact and conclusions of law in such adjudication, because, in dismissing the other three exceptions, we necessarily determine that the former *cestui que trust* is entitled to no part of the dividend, irrespective of when it, or any part of it, was earned.

Accordingly, all exceptions are dismissed and the adjudication is confirmed absolutely.

HENDERSON, J., dissenting.—I must dissent from the action of the majority. The facts relating to these dividends are readily ascertainable and a court of equity should do only one thing—apportion the dividend among those entitled thereto. In Miller's Estate, January Term, 1909, No. 65, I had a similar question before me, and apportioned the dividend among those entitled, and as no exceptions were filed, the question did not come before the court *in banc.* I will quote from that adjudication:

"It will be observed that at the time of the death of the widow, March 31, 1919, the surplus of the company was $2,583,950.40, almost enough to pay the stock dividend of $3,000,000. It should further be observed that the earnings, after the death of the widow, were more than sufficient to pay the stock dividend. The question is, therefore, presented for determination, should this stock dividend be awarded to the life-tenants as of the date of its declaration, or should it be apportioned between the life-tenants as of the date of the death of the widow and the present life-tenants in the proportion which the whole surplus bears to the surplus existing at the date of the death of the widow and the surplus earned from that date down to the declaration of the dividend bear to one another. If the dividend is to be apportioned among the succeeding life-tenants as of the date of the death of the widow, two-thirds of the portion payable to the life-tenants as of that date would be awarded to the estate of the widow, and would thence pass to the three daughters alone, and the remaining one-third of this portion would pass under this testator's will equally to the four children—the three daughters and the son; and then that part of the dividend apportioned to the period after the death of the widow would pass equally to the four children. In other words, if the dividend is to be apportioned, the widow's estate would be entitled to two-thirds (that being her share of the income under the will) of $\frac{\$2,583,950.40}{\$6,491,496.99}$ of $3,000,000 of the dividend of 4446 shares. On the other hand, if this extraordinary stock dividend is not to be apportioned between

Graham's Estate.

the succeeding life-tenants, then it would all be awarded to the present life-tenants—the four children. The question now raised—of apportioning an extraordinary stock dividend, payable out of surplus, among succeeding life-tenants—appears largely as one of first impression. . . . Of the surplus of over $6,700,000 to the credit of the company on the date of the dividend, over $2,500,000 was earned before the death of the widow on March 31, 1919. Had that amount been earned in the lifetime of the testator and divided after his death, there can be no doubt but that it would have been awarded to the trustee as *corpus*. If the amount earned in the lifetime of the widow had been divided, there is equally no doubt that it would have been awarded to her. If the dividend had been declared one year after her death, wholly of the accumulated earnings in her lifetime, I can see no reason why they should not be awarded to her personal representative. . . . Turning now to the will of the testator, we find that two-thirds of the profits of his estate were given to the widow for life, and the question recurs, shall we go back of the form of the distribution of profits by this corporation, grasp the real facts, and award them to the parties entitled thereto under the will at the time they were earned? There is only one answer a court of equity can make, the one ordered by this adjudication. . . . The stock dividend of 4446 shares of the American Laundry Machinery Company, together with any cash dividends that may have been declared on those shares, is awarded to Mary Miller (the deceased widow), Emma Miller Wood, Caroline H. Miller, Charles J. Miller, and the Land Title and Trust Company, guardians of the estates of Katherine May Sauter and William V. Sauter, Jr., minors, in the proportions directed by this adjudication, the award to Mary Miller to be paid to her personal representative."

I would follow the same procedure in the instant case.

VAN DUSEN, J., did not sit.